## HUBBARD *v.* OLIVER.

1. VARIANCE—NOVATION—FRAUD—CORPORATIONS— STOCK—SALES.
There was not a fatal variance, in an action for fraud in a transaction whereby plaintiff canceled certain notes due from defendant, the principal stockholder of a corporation, in exchange for stock in the concern, issued to and standing in the name of defendant who claimed that he caused the amount of the notes to be credited on the company's books to working capital and that the corporation had, without plaintiff's knowledge, assumed to pay the indebtedness; the suit was properly brought against defendant, instead of the corporation, in the absence of testimony that plaintiff consented to a substitution of debtors.

2. SAME—SALES.
As to two shares of stock directly purchased and paid for by plaintiff, an action for fraudulent representations alleged to have been made by defendant was properly brought against him, after rescission and tender of the stock.

3. FRAUDS, STATUTE OF—REPRESENTATIONS AS TO CREDIT OF ANOTHER.
Plaintiff's case was not governed by the statute requiring representations as to the credit of another person to be in writing, where the proofs showed that defendant sold his own stock, not that of the corporation, and made false statements relating to the value of its property, its net assets and the stock conveyed. 3 Comp. Laws, § 9518, 4 How. Stat. (2d Ed.) § 11402.

4. FRAUD—KNOWLEDGE OR NOTICE—INTENT.
False or fraudulent representations made by defendant as to the value of the stock transferred to plaintiff were actionable whether or not the defendant knew they were false.[1]

5. SAME—OPINION.
Where defendant was the majority stockholder of a corporation which he had established and had managed and controlled, his representations as to the value of the net assets of the company and of its stock were not mere matters of opin-

[1] As to whether statements made without knowledge of falsity constitute a ground of action for fraud, see note in 18 L. R. A. (N. S.) 379.

ion, but were actionable in favor of plaintiff who had been a mere traveling salesman of the corporation, and who relied on the superior knowledge of defendant.

6. SAME—RESCISSION—TENDER.

And where plaintiff tendered back to defendant the stock received by plaintiff as increased by the act of the corporation increasing its captial stock, after he obtained the shares of defendant, the tender was sufficient; and though plaintiff brought suit for a money judgment the claim of defendant that by so doing he deprived defendant of his defense of usury on certain notes surrendered by plaintiff to him in payment of the stock, was not tenable.

7. SAME—USURY.

While a voluntary payment of a usurious claim does deprive the injured party of any right to recover it, the theory of plaintiff was that he had been fraudulently induced to acknowledge payment of the notes, that payment had not in fact been made, and accordingly he is entitled to recover only the amount legally due on the notes after deducting the interest to the date of sale and that part of the principal which represented usury.

8. SAME—EVIDENCE.

The trial court was right in excluding testimony offered to show the value of the corporate assets at a time subsequent to the date of the sale of stock.

9. SAME.

And it was proper to exclude evidence of the earning capacity of the company, on a record showing that defendant's representations excluded that element of value.

Error to Kent; McDonald, J. Submitted October 17, 1912. (Docket No. 127.) Decided December 17, 1912.

Case by George C. Hubbard against Joseph W. Oliver for fraud and deceit. Judgment for plaintiff. Defendant brings error. Affirmed on condition.

*Norris, McPherson & Harrington,* for appellant.

*Kleinhans & Knappen,* for appellee.

Prior to the year 1907, defendant was the sole owner and operator of a manufacturing business, which he ran

under the name and style of "Oliver Machinery Co." He had started the enterprise about the year 1900 in a small way and without capital. The business met with considerable success from the outset. In the year 1902 the plaintiff, then about 27 years of age, was hired by defendant to act as a traveling salesman, vending the product of the business owned by defendant. Plaintiff's salary in the beginning was $75 per month. He had been brought up upon a farm in Vermont, had graduated from the Agricultural College of that State, and had traveled two years selling headstones for the Vermont Marble Company. Up to the time of hiring with defendant, he had no knowledge of the machinery business. After his engagement he spent about 10 days in the factory learning the points of the machinery he was to sell. He then went on the road, and thereafter visited the shop infrequently and spent little time in each visit. He had no knowledge of the cost or value of defendant's plant and equipment, nor of the cost of the machinery he was selling.

In the year 1907 defendant, having built and moved into a new factory, incorporated his business under the same name he had theretofore used. The capital stock of the company was placed at $150,000, $100,000 common and $50,000 preferred. All the common stock, except two or three qualifying shares, was issued to defendant. Some time prior to the incorporation, and on April 18, 1906, defendant had become indebted to plaintiff for unpaid salary to the amount of approximately $2,000. Defendant suggested that plaintiff leave this money in the business, taking defendant's personal notes therefor. Plaintiff informed defendant that he was in a position to secure 10 per cent. upon his money by loaning it in a western State; whereupon defendant agreed to add to the principal a sum sufficient, with the 6 per cent. provided in the notes, to make the interest 10 per cent. This was accordingly done, and on the last-named date defendant gave to plaintiff two notes. Both bore the same date,

the same rate of interest, and ran for one year. One was for $1,037.74; the other $1,038.92.

These notes were not paid at maturity, but shortly thereafter defendant suggested to plaintiff that he should take some of his (defendant's) stock in the corporation in lieu thereof. At this conference it is undisputed in the record that defendant represented to plaintiff that the net assets of the corporation, exclusive of good will, amounted to $300,000 or $350,000. As the common stock was but $100,000, this valuation would make each $1 thereof worth from $3 to $3.50. No sale was consummated at this interview, but on May 29, 1907, defendant wrote the following letter to plaintiff:

"GRAND RAPIDS, MICH., 5/29/07.
"(Personal).
"Mr. G. C. HUBBARD,
        "c/o 'Oliver' Machinery Co.,
                "New York, N. Y.
"*Dear Hubbard:*
    "We have your favor of the 27th in which you are making disposition of the money we have of yours on hand. Your wishes will be cheerfully acceded to, in regard to sending $500.00 to Mr. Campbell, Great Falls, Montana. With respect to the balance, would suggest that if the propositions made you are acceptable now and you care to join forces with us we would let you have some of our common stock at 300 instead of 350 as was offered when you were here last.

    "We have no particular desire to dispose of this stock but presume that it is somewhat desirable on your part to become identified with us in that way. We are going to dispose of some to Mr. Lovell, and inasmuch as the writer does not care to make a profit on the sale of this stock, but merely selling it for what it is worth, we think this opportunity to invest a small sum on your part would be a good idea.

    "If this is satisfactory to you kindly instruct us, and we will forward you the stock certificates and get our balances squared up in that way. With best wishes, believe me,
                "Yours very truly,
                        "J. W. OLIVER."

This offer was accepted by plaintiff, and defendant sent him eight shares of the common stock in the following letter:

"GRAND RAPIDS, MICH., June 27, 1907.
"GEORGE C. HUBBARD, Mgr.,
    "Oliver Machinery Co., N. Y.
"*My Dear Mr. Hubbard:*
    "Replying to yours of the 22d inst., beg to call your attention to the inclosure of certificate for eight shares of common stock of the 'Oliver' Machinery Co., the net price of which is $2,400.00.
    "Mr. Thompson will inclose in this letter a statement of your account, which we trust will prove satisfactory, and we will be glad indeed to have you return the notes you hold against us in payment for this stock.
    "The reason for the delay in sending you this stock is that the writer forgot to get it out of the safe at home two or three days, and then it had to be taken back and forth to the bank to have it registered, and between it all it has taken time. We trust, however, that it is just as valuable now as it would have been a few days earlier,—besides your notes are that much more valuable—nothing like having an eye for business.    *    *    *
    "With kindest regards, believe me,
                        "Yours very truly,
                        "J. W. OLIVER, Prest.,
                            "Oliver Machinery Co."

On July 6, 1907, plaintiff inclosed in a letter to the Oliver Machinery Company the two notes, indorsed upon the face of each:

"Received payment in stock in the Oliver Machinery Co.  George C. Hubbard.  July 5, 1907."

The two notes, with interest, amounted on that day to $2,235.90. Plaintiff had at the time a further balance due for salary amounting to $850, from which was deducted sufficient to make the sum up to $2,400, the agreed purchase price of the eight shares. On March 17, 1908, defendant wrote plaintiff, urging him to take some of the preferred stock in lieu of salary. To this request plaintiff replied that he would prefer to take more common stock,

but thought, as dividends were so long deferred, the price should be less than $300 per share.   Defendant replied:

"In reference to your taking your salary in common stock under all the circumstances, would say that the writer would let you have two more shares at $275.00 each instead of $300.00 as you formerly paid."

This proposition was accepted by plaintiff, and two shares of. defendant's stock were transferred to him and his account debited with the cost, $550.

The proceeds of both sales of stock were credited to an account on the books of the corporation called "Working Capital." Whether this account represented entirely sums advanced by defendant to the corporation for which he became its creditor is not explained in the record. During all the time since the organization of the company, defendant has been its president and general manager, and has been at all times, and still is, the owner of the vast majority of the stock.   In 1909 the capital stock of the corporation was increased to $650,000, $50,000 preferred and $600,000 common; $400,000 of the common stock was issued to the holders of the original stock in the ratio of four to one.   Through this inflation plaintiff received a certificate for 40 shares in lieu of the 10 shares he then owned.   He was present at the stockholders' meeting at which the increased capitalization was authorized, and voted in favor of the resolution.   On September 6, 1911, plaintiff was discharged.   For several years prior to that event he had been in charge of the eastern business of the Oliver Machinery Company, with headquarters in New York.   Upon receiving his discharge, he repaired to Grand Rapids and began an investigation of the affairs of the company.   He found that defendant, over his own signature, had certified in his annual reports that the net assets of the corporation in 1908 were but $87,952.62, in 1909 they were $77,499.24, in 1910 they were $78,363.02. If the preferred stock issued and outstanding in each of these years is considered as a liability in determining the

net assets, these totals would each be reduced about $36,-000, thus making the total of net assets about $50,000. In each of the reports in question the defendant certified that "the value, as near as may be estimated, *of all property* owned by the corporation, itemized as follows: Good will—nothing."

Plaintiff, having become convinced that the value of the stock had been misrepresented to him, tendered the same to defendant and demanded a return of his money. This being refused, he brought suit. The declaration is in trespass on the case, and avers that plaintiff bought the stock in question from defendant and paid defendant therefor. The plea was the general issue. Plaintiff recovered a judgment for $3,597.53, and defendant has brought the case here for review.

BROOKE, J. (*after stating the facts*). At the close of plaintiff's proofs, defendant moved for a directed verdict, upon the ground that there was a fatal variance between the declaration and the proofs. It is defendant's contention that the transaction, in essence, was between plaintiff and the Oliver Machinery Company, and that the consideration for the stock was paid by the discharge of an indebtedness of $2,950 owing from the corporation to the plaintiff. We think this position of defendant untenable. In the first instance, it is undisputed that the stock sold was all the personal property of defendant. It was not treasury stock. In the next place, the two notes turned over in the purchase of the first eight shares represented a personal liability of defendant to plaintiff. It is claimed that the record shows conclusively that the corporation had assumed liability for these notes. We do not think it at all clear that this debt was assumed by the company. It certainly was not paid by the company; for, as before pointed out, the stock which paid it was defendant's stock. If, as between defendant and his corporation, the corporation was obligated to pay the debt, then defendant, in himself paying it, and causing the amount thereof to be

credited to "Working Capital," became a creditor of his company to that extent. But, as between defendant and the corporation, it is not important to determine whose duty it was to pay the debt. It is not claimed that plaintiff ever knew or assented to a substitution of debtors. As between him and defendant, defendant was unquestionably liable. This disposes of defendant's claim, so far as it affects the eight shares first purchased.

It is urged, however, that the last purchase of two shares stands upon a different footing. It is true that as to that purchase defendant was not personally indebted to plaintiff when it was made. The stock sold, however, was the defendant's stock, and plaintiff made payment therefor in the manner solicited by the defendant. We think it may well be said that payment was made to defendant. Defendant certainly was under no legal obligation to pay the salaries of the employés of the corporation, and in doing so and causing the amount to be credited to "Working Capital" it may well be assumed that defendant became a creditor of his company for the amount so paid. The method of bookkeeping adopted by defendant for his corporation was a matter of no moment to plaintiff, and one over which he had no control. It must be borne in mind that in the beginning the defendant owned practically all of the common stock of the company, and at the time of the trial he still owned $320,000 of the $400,000 issued. He was in a position to take personal credit for the payment of these debts, and it made little difference in fact whether he took credit as an individual, or in the name of the corporation which he owned. There was no variance between the pleadings and proofs.

The defendant next claims that the statute of frauds precludes recovery, the representations having been made as to the credit of another, citing *Bush* v. *Sprague*, 51 Mich. 41 (16 N. W. 222), *Hubbard* v. *Long*, 105 Mich. 442 (63 N. W. 644), and *Getchell* v. *Dusenbury*, 145 Mich. 197 (108 N. W. 723). All these cases are clearly

distinguishable from the case at bar.    In *Hubbard* v. *Long, supra,* it is said:

"It appears that the arrangement for the purchase was made with the defendant, but the money was paid directly to the bookkeeper of the furniture company, and defendant never received personally a dollar of the purchase price. The fact appears conclusively that the stock which plaintiff received was unissued stock of the company, and which the defendant never possessed."

In *Getchell* v. *Dusenbury, supra,* Mr. Justice GRANT said:

"The defendant directors were not acting in their own behalf. They were not selling their own stock. They made no profit by the transaction. * * * Defendant Bahlke occupies a different position in the transaction than do the other defendants. He was the only one who was directly to profit by the transaction by receiving a commission. * * * I think that under the authorities the statute does not cover the representation made by Bahlke. See *Krause* v. *Cook,* 144 Mich. 365 (108 N. W. 81).

In the instant case defendant not only owned the stock sold, but, as we have seen, by means of the transaction he secured release of a personal liability upon more than $2,000 of paper. As was said in *French* v. *Fitch,* 67 Mich. 492, at page 494 (35 N. W. 258):

"The statute was never intended to apply to a case like the present. The representations made were as to the value, *then* and *prospective,* of the property of the defendant, and which he was selling to the plaintiff. The fact that the representations were applied as well to the company's property as to the defendant's, cannot affect the defendant's case."

"It is well settled that the statute is limited in its application to cases in which the representation is made for the purpose of obtaining credit for a third person." 20 Cyc. p. 196, and cases cited in note 83.

Here the defendant, by means of his alleged false statements, did not undertake to secure credit for the corpora-

tion, but did undertake to sell to plaintiff his own property.

The third and fourth positions of defendant are stated in appellant's brief as follows:

" (3) There was no proof of misrepresentation nor of wilful or reckless misstatement.

" (4) The representations were of opinion, and not actionable:

" (a) There was no evidence of superior knowledge which would make inapplicable the rule of *caveat emptor*.

" (b) There was no warning to defendant that plaintiff was not capable of judging for himself, and that he would rely on the defendant's opinion.

" (c) The opinion was not coupled with any representation of fact, and a mere opinion is never actionable, unless all the elements of the superior knowledge rule are present.

" (d) If the trial judge should not have held that the representations were of opinion only, he should have submitted the question to the jury."

These will be considered together. Upon this subject the court charged the jury in part as follows:

" (1) That the representations were made as he claims, and that they were false; (2) that the defendant knew the representations were false when he made them; or (3) that, without any knowledge of their truth or falsity, he made them recklessly, for the fraudulent purpose of inducing the plaintiff to purchase the stock; (4) that the plaintiff relied upon the representations, and was damaged thereby.

" Taking up in their order these elements of the plaintiff's case, you will first consider: Were the representations made by the defendant false? You will remember that the representations which it is claimed the defendant made were that the stock was worth more than three times its par value, or was worth at least $300 a share, and that the net assets of the corporation were three times its capital stock, or $300,000. Testimony has been offered and received in evidence as bearing upon the value of the stock at the time it was purchased and the net assets of the corporation. From this evidence you will determine whether the representations made by the defendant were true or false. If you find that they were true, then the defendant made no false representations, and the plaintiff

cannot recover.   If you so find, you need not further consider the case; for your verdict in that event will be, ' No cause of action.'   But if you find that the representations were false you will then consider the second element: Did the defendant know the representations he made were false ?

"In considering this question you may consider all of the elements in the case that may have any bearing on the defendant's knowledge at the time he made the representations; and if you find that he did not know they were false you will then consider whether he made the statements recklessly of which he had no knowledge, and without regard to their truth or falsity, intending in making them to defraud the plaintiff and deceive him, and induce him to make the purchase; for, as I said, if the defendant made false representations and knew they were false, or if he made statements of which he had no knowledge, intending in making them to defraud the plaintiff, and relying on those statements the plaintiff was defrauded, the plaintiff could recover.

"It is just as much fraud for a man to make statements of which he has no knowledge in a reckless disregard of the truth as to make statements with the knowledge that they are false; and if you find that the representations were false, and that the defendant knew they were false, or without such knowledge made them recklessly, you will then consider the next element of the plaintiff's case, viz. : Did the plaintiff rely upon these representations, and was he damaged thereby ?

"In order to hold the defendant liable for false representations, it must appear that they were the proximate cause which induced the plaintiff to make the purchase. It is not necessary, however, that they were the sole cause, or the sole or principal inducement to the plaintiff to buy the stock; but it is sufficient for plaintiff's recovery if you shall find that the representations as to the value of the stock and assets were false and known by the defendant to be false, or made recklessly, or made without knowledge and in reckless disregard of the truth, and exerted a material influence upon the mind of the plaintiff to induce him to purchase the stock.   In other words, the plaintiff may recover, even though there were other inducements that led him to make the purchase; but, as I said, the defendant would be liable for his false representations if they exerted a material influence upon the mind of the

plaintiff to induce him to purchase the stock. That is the question for you to consider in determining if the plaintiff relied upon the representations.

"If you find that these various elements which I have explained to you were present in this case, they will constitute fraud on the part of the defendant. Fraud is the gist of this action. Fraud is never presumed, but must be proved; and the burden of proof is upon the party alleging the fraud to prove such allegations by a fair preponderance of the evidence. It cannot be lightly inferred, but must be proved as alleged.

"If the defendant is guilty of fraud, it means that he knowingly, intentionally, and fraudulently deceived the plaintiff, as I have heretofore instructed you. If you find that the defendant was guilty of fraud—that is, that he made false representations knowing that they were false, or made false representations without such knowledge, but recklessly and with a disregard as to their truth, and the plaintiff relied thereon, and thereby was induced to purchase this stock—then your verdict should be for the plaintiff. If you find from the evidence and instructions which I have given you that these various elements, or any of these various elements, of the plaintiff's case have not been proven by a fair preponderance of the evidence, your verdict will be for the defendant."

This charge is, to say the least, as favorable to defendant as he had the right to demand. This court has frequently held that *scienter* is not necessary to sustain the action. *Aldrich* v. *Scribner*, 154 Mich. 23 (117 N. W. 581, 18 L. R. A. [N. S.] 379), and cases there cited.

Was the representation one of fact or opinion? On cross-examination defendant testified:

"*Q.* You offered it to him at 350 when he was there at that conversation, didn't you?

"*A.* Yes.

"*Q.* Did you tell him at that time what the net assets of the company were, that they were about $350,000, at that conversation?

"*A.* I dare say I did.

"*Q.* What is that?

"*A.* Undoubtedly I must have done so?"

It seems obvious to us that this is not a mere expression

of opinion, but is clearly an assertion of a fact. It is urged that the rule of *caveat emptor* should be applied, upon the ground that the record does not show the defendant to have had superior knowledge of the facts. We are somewhat at a loss in endeavoring to follow defendant's argument upon this point. Defendant undoubtedly had the means of ascertaining accurately the facts he represented, and we think the record demonstrates that he had ascertained them. He was the founder, general manager, and principal owner of the business. Its books and system of accounting were under his supervision and control. All its assets had been acquired under his immediate supervision, and he knew their value as no other individual knew or could know it. On the other hand the plaintiff had never seen an inventory; nor did he know the amount of the obligations of the corporation. His activities in relation to the company were performed at a distance from the factory and in a subordinate capacity. Moreover, the relations existing between plaintiff and defendant at the time both sales were made were such as necessarily to import confidence on the one hand and ability to exert influence upon the other. Under such circumstances the representations, even if doubtful in character, should be held to be more than mere expressions of opinion. *Moon* v. *McKinstry*, 107 Mich. 668 (65 N. W. 546); *Coulter* v. *Minion*, 139 Mich. 200 (102 N. W. 660).

Defendant next contends that there could be no rescission, because plaintiff did not try to restore the *status quo*, in so far as he was able to do so. This claim is based upon two grounds: *First*, that in demanding money instead of the return of his notes he has deprived defendant of his defense of usury in an action upon the notes; and, *second*, that to return 40 shares under the increased capitalization is not the exact equivalent of returning 10 shares under the old capitalization. With reference to the first claim, the court charged:

"Under the statute of Michigan in force at the time when the notes were executed, 7 per cent. was the maximum rate of interest which a creditor could lawfully contract for, and the statute in effect at that time provided that if a greater rate of interest should be contracted for, either directly or indirectly, the defendant should not be compelled to pay any interest whatever upon the indebtedness, but such claim of usury can be waived by the party entitled to claim it. If he pays voluntarily, he waives the usury, and cannot recover it back. That was done in this case. The notes contained the usurious interest, paid upon the transfer of the stock, and the defendant thereby lost any right to claim usury."

We think the learned circuit judge was in error in this portion of his charge. It is undoubtedly true that one who voluntarily pays a usurious claim cannot recover it back. The trouble with the proposition is that the plaintiff is here urging that his claim has not been paid; that he has been fraudulently induced to acknowledge payment when none has in fact been made.

It seems plain that, if successful in his action, plaintiff is entitled to recover only that which he paid for the stock he received. If he did so recover, he would be in possession of the two notes against which, under the admitted facts, the defense of usury might be urged.

Defendant's nineteenth request embodied an instruction that in determining the amount plaintiff paid for the stock the usurious interest must be deducted. The other ground urged upon this branch of the case is without merit. When one chooses to disaffirm a contract upon the ground of fraud, it is his duty to restore the other party to the same situation he would have been in if the contract had not been made, so far as it then can be done. The law requires only that the plaintiff restore what he has received. That plaintiff tenders in this case. If the stock returned has any different value, relative to the whole issued stock, from that issued originally to plaintiff (which may well be doubted), that difference was brought about by the act of the defendant, who, being in control,

caused the increased capitalization. *Jewett* v. *Petit*, 4 Mich. 508; *O'Shea* v. *Vaughn*, 201 Mass. 412 (87 N. E. 616).

The last ground for reversal urged by defendant is that the court erred in excluding certain testimony as to the value of the assets of the corporation in 1911 and its earning capacity during a series of years. We think the evidence was properly excluded. The issue here was: What was the net value of the assets in 1907 and 1908, when the sale was made? The value of those assets in 1911 would not affect the question, nor, in our opinion, would their earning capacity. It is, of course, well understood that it is a common practice in modern high finance to capitalize "earning capacity." That element, however, is eliminated in this case, as the basis of the sale was "net assets" exclusive of "good will." The amount of the usurious interest inserted in the notes was $76.66. The interest accruing thereafter to the date of sale was $162.29, making a total of $238.95.

The judgment will be reversed and a new trial ordered, unless the plaintiff, within five days, remits this amount from his judgment, in which event it will stand affirmed at the reduced figure.

MOORE, C. J., and STEERE, MCALVAY, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.